Filed 4/17/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BOMATAMUNOPIRI A. BIPIALAKA,<br><br>    Defendant and Appellant. | B285656<br><br>Los Angeles County<br>Super. Ct. No. GA099730 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jared D. Moses, Judge.  Affirmed and remanded with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

After using methamphetamine, Bomatamunopiri Bipialaka led police on a car chase. During the chase, he targeted another car in an intersection. He ran the red light and sped at the car without braking because "I was just going crazy and felt like freaking them out." Bipialaka swerved in the nick of time and hurtled away.

Bipialaka appeals his convictions for using his car in an assault with a deadly weapon. He also asks us to review proceedings under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 and to correct clerical errors in the abstract of judgment. Bipialaka requests remand so the trial court can exercise discretion about dismissing a sentence enhancement, based on Senate Bill No. 1393 (2017–2018 Reg. Sess.). In supplemental briefing, Bipialaka argues fees must be reversed and a restitution fine stayed in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We remand for resentencing and direct the trial court to prepare a corrected abstract of judgment. We otherwise affirm.

I

We state the facts in favor of the prevailing trial party.

After a weeklong shoot, cinematographer Bipialaka used drugs at a motel and then drank at a bar. He felt "real jittery," "very clammy and jittery and I don't know, my—my heart was moving in a different way." Bipialaka then set off for a hospital because "I've done this drug before in the past and I've had episodes before where, you know, I passed out." Bipialaka could "just feel my heart beating and I was pretty much panicked at that point in time. I was pretty much in a panic mode, and just making irrational decisions."

2

Bipialaka then made a hood-like mask: "After awhile adrenaline took over and I just went crazy. I don't know what's up with the hood. I just felt like fuck it. I'm going to go off. So I took a shirt and cut some eye holes in it and made a mask to freak people out."

A deputy sheriff saw Bipialaka speed by and gave chase. Bipialaka drove towards a red light "at a fast speed." Bipialaka ran the red light and entered the intersection "really quick," with no braking.

Bipialaka deliberately aimed at a couple in a car that had entered the intersection on a green light. The other driver saw Bipialaka coming at him wearing a mask and yelling threats. That driver stopped, fearing for his safety. Had he not stopped, there would have been a crash. Driving at high speed, Bipialaka came "very near" to the other car—"really close to us." Bipialaka swerved and barely avoided a collision. The close call left the driver and passenger in the target car afraid and shaken for hours.

Bipialaka purposely drove at the couple in the car because "I was just going crazy and felt like freaking them out."

Bipialaka accelerated out of the intersection. Police eventually cancelled this chase for safety reasons.

The jury convicted Bipialaka of four counts: one count of assault upon a police officer (Pen. Code, § 245, subd. (c), count 1), one count of fleeing a pursuing peace officer's motor vehicle while driving recklessly (Veh. Code, § 2800.2, count 2), and two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), counts 3 & 4).

Bipialaka challenges only his convictions for assault with a deadly weapon upon the two people in the target car.

## II

Bipialaka argues insufficient evidence supports his two convictions for assault with a deadly weapon. Citing *People v. Williams* (2001) 26 Cal.4th 779, 782, he says these convictions violate his due process rights because driving through a red light did not probably and directly result in the application of force to a person.

Bipialaka's argument is incorrect. Traditionally, cars can be deadly weapons. This law is not new. (E.g., *People v. Mortensen* (1962) 210 Cal.App.2d 575, 577–584, see *People v. Perez* (2018) 4 Cal.5th 1055, 1065 [listing vehicle cases], cf. Model Pen. Code & Commentaries (1980) com. 5 to § 211.1, p. 191 ["[A]n auto is not normally a deadly weapon. . . . But if an actor purposely aims his car at a pedestrian, he must know perfectly well that such use of the automobile is capable of grave harm. In that case, therefore, a car fits the definition of a deadly weapon."].)

Bipialaka invokes the *Williams* decision. That case governs here. Its test for assault is whether a reasonable person, viewing the facts known to Bipialaka, would find that the act in question would directly, naturally, and probably result in physical force being applied to another, i.e., a battery. (*People v. Williams*, *supra*, 26 Cal.4th at pp. 787–788 & fn 3.)

Under *Williams*, Bipialaka committed assault. The *Williams* analysis focuses on the facts Bipialaka knew. He knew he had donned the mask for the purpose of scaring others. He likewise knew he opportunistically targeted people in another car to the same end. Bipialaka knew his purpose was to use his masked face and his speeding car to freak them out. Targeting a car this way would directly, naturally, and probably result in

4

physical force being applied to the target car because a high speed collision applies force to the victim car and its occupants. These facts, all known to Bipialaka, satisfy the *Williams* test for assault.

Bipialaka protests he was not attempting to injure anyone and was just driving recklessly to flee police when he inadvertently encountered the couple in the car in the intersection. He underlines he swerved to avoid a crash.

This argument ignores the evidence Bipialaka acted with purpose. His purpose was to frighten others with physical menace. His physical menace threatened his victims with bodily injury. That threatened injury was serious and imminent. Bipialaka was not merely reckless. He had purpose of a particular kind. That purpose moved his culpability beyond recklessness.

Bipialaka's swerve does not alter the analysis. Assault does not require an intent to cause an application of physical force or substantial certainty that force will be applied. (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186–1187.) As he bore down on his target, Bipialaka achieved his purpose of scaring his victims into believing a serious collision was imminent. He attempted by physical menace to put others in fear of imminent serious bodily injury. That is assault under *Williams*.

Bipialaka's case is easier than *Williams*. The evidence against Bipialaka was stronger than the evidence against defendant Lebarron Keith Williams in *Williams*, because the *Williams* case contained a crucial ambiguity not present here. The ambiguity is about whether the threat of physical injury was or was not imminent.

The imminence of the threat is significant in the law of assault.  (Cf. *People v. Williams*, *supra*, 26 Cal.4th at p. 786 [An assault is an act done toward the commission of a battery and must *immediately* precede the battery.  Assault occurs when *the next movement* would, at least to all appearance, complete the battery.].)

The ambiguity in *Williams* concerned the imminence of the threat.  Williams used a shotgun to blow out a truck tire while his romantic rival crouched on the other side of the truck.  (*People v. Williams*, *supra*, 26 Cal.4th at pp. 782–783.)  The shotgun blast hit the car but not the rival.  Williams called it a "warning shot." (*Id.* at pp. 782, 790.)

This "warning shot" description created the ambiguity about imminence.  Did Williams threaten imminent physical injury?  If Williams was aiming for the rival and missed only because the truck blocked the shot, then Williams did intend injury that was imminent:  he meant to shoot the man.  But if his warning shot was simply a caution for the future—stay away from that woman or else—then Williams was warning the rival to alter indefinite future plans.  Physical injury is not imminent when a threat relates only to the indefinite future.

This case has the certainty *Williams* lacked.  Without doubt, Bipialaka's threat was imminent.  He raced across the intersection without braking.  Bipialaka's relationship with his victims was immediate and immediate only:  it had no future. Under *Williams*, then, we must affirm because the case against Bipialaka is stronger and less ambiguous than was the case against Williams.

Bipialaka cites cases predating *Williams* (e.g., *People v. Wolcott* (1983) 34 Cal.3d 92, 99) but we must follow governing

6

law from *Williams*, which sought to clarify past law.  (See *Williams*, *supra*, 26 Cal.4th at pp. 787 [because past language may have been confusing, "we now clarify the mental state for assault"] & 782 ["Today, we once again clarify the mental state for assault . . . ."].)  Indeed, our Supreme Court has been working on this issue since 1856.  (*People v. Colantuono* (1994) 7 Cal.4th 206, 213 [citing *People v. McMakin* (1856) 8 Cal. 547 after stating that "[d]eciphering the requisite intent for assault and assault with a deadly weapon has been a recurring task for this court"].)

Bipialaka also quotes *People v. Ervine* (2009) 47 Cal.4th 745, 805, which contains the statement that an "intent to frighten or mere reckless conduct is insufficient."  This quotation, however, is from a 1996 trial court jury instruction, not from a Supreme Court holding modifying *Williams*.  (*Id.* at pp. 753, 805.)

The 2001 *Williams* decision governs this case.

Our application of *Williams* meshes with longstanding and prestigious authority that is persuasive.  In the words of the Model Penal Code, Bipialaka "attempt[ed] by physical menace to put another in fear of imminent serious bodily injury."  (Model Pen. Code, § 211.1, subd. (1)(c).)  That is assault.

Looking to the assault provision in the Model Penal Code is valid because this provision explains the *Williams* holding simply, clearly, and precisely.

California courts routinely turn to the Model Penal Code for guidance and clarity.  (E.g., *People v. Clark* (2016) 63 Cal.4th 522, 617–618 & fn. 73 [noting the "Model Penal Code definition of recklessness has been recognized in other areas of California criminal law" and applying it to determine whether defendant showed reckless indifference to human life]; *In re Joseph G.* (1983) 34 Cal.3d 429, 433 [observing "no state, including

7

California, has a statute making a successful suicide a crime, nor does that Model Penal Code recognize suicide as a crime" and analyzing the Model Penal Code drafters' rationale for not attaching criminal liability to suicide attempts].)

Courts consult the Model Penal Code because it offers precision in a field long plagued by imprecision. Dean Sanford H. Kadish, the renowned scholar of criminal law, observed the Model Penal Code's "mens rea proposals dissipated these clouds of confusion with an astute and perspicuous analysis that has been adopted in many states and has infused thinking about mens rea everywhere. . . . [A]s a result of the [Model Penal] Code, . . . [t]he fog that surrounded centuries of controversy over the requirement of mens rea has been lifted, one hopes, permanently." (Kadish, *Fifty Years of Criminal Law: An Opinionated Review* (1999) 87 Cal. L.Rev. 943, 952, 981.)

Esteemed Judge Gerard E. Lynch of the Second Circuit Court of Appeals, who is also the Paul J. Kellner Professor of Law at Columbia Law School, writes that "all criminal law scholars understand [that] the Model Penal Code is one of the great intellectual accomplishments of American legal scholarship of the mid-twentieth century." (Lynch, *Revising the Model Penal Code: Keeping It Real* (2003) 1 Ohio State J. Crim. Law 219, 219.)

Distinguished scholar Peter Low doubts "there are very many teachers of the substantive criminal law who do not take the Model Penal Code as their major text, or at least as one of their major texts." (Low, *The Model Penal Code, The Common Law, and Mistakes of Fact: Recklessness, Negligence, or Strict Liability?* (1988) 19 Rutgers Law J. 539, 540.)

"The Model Penal Code's influence has not been confined to the reform of state codes. Thousands of court opinions have cited

the Model Penal Code as persuasive authority for the interpretation of an existing statute or in the exercise of a court's occasional power to formulate a criminal law doctrine." (Robinson & Dubber, *The American Model Penal Code: A Brief Overview* (2007) 10 New Crim. Law Rev. 319, 327.)

This provision of the Model Penal Code is persuasive authority. Its formulation is from the common law. (Model Pen. Code & Commentaries (1980) introductory note, p. 172 ["Section 211.1 effects a consolidation of the common-law crimes of mayhem, battery, and assault"].) It meshes with California's statutory definition of simple assault, which governs here and which also is from the common law. (See Pen. Code, § 240 ["An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."]; *People v. Williams*, *supra*, 26 Cal.4th at p. 786 [determine the meaning of "attempt" in Pen. Code § 240 by looking to the common law definition of assault].)

This provision of the Model Penal Code is consistent with *People v. Williams*. It simplifies and clarifies analysis and is true to California law. It further illustrates that substantial evidence supports Bipialaka's convictions for assault with a deadly weapon.

III

Bipialaka also requests we review the trial court's December 21, 2016 in camera proceedings to determine whether the trial court abused its discretion in finding no discoverable documents. The People do not object. Bipialaka sought the personnel records of a particular deputy. The trial court conducted a hearing on fabrication of evidence and on writing

9

false police reports.  After reviewing the documents in camera, the trial court concluded there was no discoverable information.

We have reviewed the sealed hearing transcript and conclude the trial court properly followed *Pitchess* procedures. The court placed the custodian of records under oath and a court reporter transcribed the proceedings.  It ordered the transcript sealed and made a detailed record of the documents it reviewed. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1229 [the trial court should make a record of the documents it examined before ruling on the *Pitchess* motion and can do so by describing them on the record].)  The court did not abuse its discretion in holding there was no evidence to be disclosed.

IV

Bipialaka also contends the trial court abused its discretion by denying his second *Pitchess* motion requesting personnel records of two additional deputies.  According to Bipialaka's counsel in a declaration accompanying the motion, one deputy falsely testified that Bipialaka drove in "donuts" in an intersection and both deputies falsely testified that Bipialaka yelled at other cars while holding a knife or shiny object out his window.  Bipialaka contends there was good cause for discovery pertaining to the fabrication of evidence, false police reports, perjury, and dishonesty.

The trial court denied the motion at oral argument without holding an in camera hearing.  The court found that the testimony at issue was "not a critical part" of Bipialaka's charges.

To show good cause for the requested discovery, defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges.  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024.)  A defendant must

10

establish not only a logical link between the defense proposed and the pending charge but also must explain how the discovery would support a defense or how it would impeach the officer's version of events.  (*Id.* at p. 1021.)

Bipialaka's motion did not propose a defense to the pending charges.  Even if the deputies fabricated the testimony (and there is no evidence they did), the testimony had nothing to do with assault on a police officer (count 1).  The testimony did not relate to fleeing a pursuing peace officer's motor car while driving recklessly (count 2).  While driving in "donuts" and waving an object could relate to reckless driving, these events were after the chase.  Further, the *Pitchess* motion did not deny Bipialaka's reckless driving during the pursuit, which included speeding, unsafe lane changes, and driving through red lights.  Falsified evidence regarding "donuts" and waving objects would not be a defense for that charge.

Finally, the testimony did not relate to assault with a deadly weapon (counts 3 & 4).  Bipialaka concedes the prosecution brought the assault charges using his car as the deadly weapon and not for using a knife or other object.  Fabricated evidence regarding "donuts" or waving objects could not have been a defense.

Bipialaka's motion did not demonstrate good cause for an in camera review of the deputies' personnel records.  There was no abuse of discretion.

V

The parties agree the abstract of judgment contains errors.  It must be amended to reflect that Bipialaka's presentence credits were calculated according to Penal Code section 4019 and not section 2933.1.  It also must be amended to reflect that a

11

$1,000 restitution fine, not a $10,000 fine, was imposed under Penal Code section 1202.4, and that a $1,000 parole revocation restitution fine, not a $10,000 fine, was imposed and suspended under Penal Code section 1202.45. We direct the trial court to prepare a corrected abstract of judgment and to forward the amended version to the Department of Corrections and Rehabilitation.

## VI

Bipialaka requests this matter be remanded in light of Senate Bill No. 1393 (2017–2018 Reg. Sess.). Senate Bill No. 1393 amended Penal Code sections 667 and 1385 to provide trial courts discretion to strike five-year sentencing enhancements based on prior serious felony convictions under section 667, subdivision (a)(1). Bipialaka asks that we allow the trial court to determine whether to dismiss his five-year enhancement. The parties agree Senate Bill No. 1393 would apply to Bipialaka if his judgment was not final when the law became effective. We also agree. (*In re Estrada* (1965) 63 Cal.2d 740, 744–745 [absent evidence of contrary legislative intent, the Legislature intends statutes reducing the penalty for a crime or providing the trial court discretion to do so to apply retroactively to all cases not final when the statutes take effect].) Because Bipialaka's case was not final when the law took effect and is not final now, we affirm the convictions and remand for the trial court's discretion as to the felony enhancement.

## VII

Bipialaka raises a *Dueñas* issue in supplemental briefing but concedes he did not object to fees or the fine in the trial court. He thereby forfeited this argument. (See *People v. Frandsen* (April 4, 2019, B280329) ___ Cal.App.5th ___ [pp. 38–42].)

12

## DISPOSITION

The matter is remanded to the trial court for resentencing. On remand, the trial court shall exercise its discretion whether to strike or dismiss the prior felony enhancement as authorized by Senate Bill No. 1393.

We direct the trial court to modify the abstract of judgment to reflect that Bipialaka's presentence credits were calculated according to Penal Code section 4019, not section 2933.1. We also direct the trial court to modify the abstract of judgment to reflect that a $1,000 restitution fine, not a $10,000 fine, was imposed under Penal Code section 1202.4, and that a $1,000 parole revocation restitution fine, not a $10,000 fine, was imposed and suspended under Penal Code section 1202.45. We further direct the trial court to forward the amended abstract to the Department of Corrections and Rehabilitation.

The judgment is affirmed in all other respects.


WILEY, J.


WE CONCUR:


GRIMES, Acting P. J.


STRATTON, J.


13